## Steel Estate

*Joseph N. DuBarry, IV* of *Montgomery, McCracken, Walker & Rhoads,* for accountant.

*W. Charles Hogg, Jr.* and *Richard W. Stevens,* for claimant.

*William C. Ferguson, Jr.,* p.p., guardian and trustee ad litem.

SHOYER, J., March 11, 1964.—This trust arises under the will and codicil, a copy of each of which is hereto annexed, of Edward T. Steel, who died August 14, 1892,

whereby he gave his residuary estate to his trustee, in trust, and after providing for the maintenance of his homestead, certain annuities and charges out of the income, now not necessary to recite, he gave the remaining income in equal one-third shares to his wife, Ida Grant Steel, and his two daughters, Anna L. Steel and Helen Steel, during their respective lives, and upon the death of his wife to pay the share of principal supporting her income to the children of their marriage, and upon the death of either daughter, Anna or Helen, to pay the daughter's share of income to such daughter's children and issue until they attain age 21, at which time the share of principal from which they theretofore received the income shall be paid to such beneficiary, and in the event of the death of a daughter without leaving issue her share of the income shall be paid over to her surviving sister, with like provision as to income and remainder as the original share of said daughter; with gift over for the benefit of testator's brothers and their issue in the event of a total failure of testator's issue.

By item fifteenthly of his will, testator provided:

"On further consideration I now hereby direct that no distribution . . . of any part of the corpus . . . be made . . . until the death of the last survivor of my wife and daughters the income only until that time be . . . distributed . . . to those entitled under the provisions of the 10 [sic] paragraph of this my will." . . .

This account was filed because of the death on May 5, 1962, of Helen Steel Grayson, a grandchild of the testator and one of the income beneficiaries. She left no children or issue her surviving. . . .

Ida Grant Steel, widow of testator, died in 1897, leaving no issue surviving of her marriage to testator.

Anna L. Steel Grayson, a daughter of testator, died November 23, 1945, leaving to survive her two children, viz: Clifford Spence Monroe Grayson, then over

21 years of age, who is still living, and Helen Steel Grayson, above mentioned, who died May 5, 1962.

After the hearings in connection with the audit seemed to have been completed, counsel requested that the filing of the adjudication be postponed. Then, for the first time, counsel for the life tenants, in view of the then recent decision by the Supreme Court in Pew Trust, 411 Pa. 96, made claim to certain stock dividends of six percent or less, which were reflected in the account in principal. Also, for the first time, the life tenant wanted to press a claim to 300 shares of General Motors Corp. which were received by the accountant on July 13, 1962, as a partial distribution on the trust's holding of 600 shares of E. I. duPont de Nemours & Co., and carried in the principal balance.

Further hearings were held and the guardian-trustee ad litem filed a supplemental report, which is hereto annexed.

1. *Distribution of one-fourth share of income accruing after the death of Helen Steel Grayson*

When testator's daughter, Anna J. Grayson, died on May 23, 1945, the one-half share of the income which she received while living thereafter became payable as accrued, one-fourth, of the entire income to her two surviving children, Clifford Spence Monroe Grayson and Helen Steel Grayson. Clifford, just mentioned, is still living. So is his aunt, Helen Steel Jones, who is entitled to one-half of the trust income. Clifford's sister, Helen Steel Grayson, having died on May 5, 1962, leaving no issue, who becomes entitled to the one-fourth share of income accruing after her death? The guardian-trustee ad litem in his report points out that under paragraph fifteenthly of the will the principal is not to be distributed until the death of the survivor of his wife and two daughters, and income only is to be distributed until that time "under the provisions of the 10 paragraph of this my will." There is no paragraph

556

"10" in the will, and the guardian-trustee ad litem concludes that testator's reference is to paragraph "Tenthly" subparagraph (8). In paragraph tenthly (8), testator directed that after the payment of certain charges out of the income of his residuary estate, one-third part of the remaining income should be paid to each of his wife and two daughters in equal shares, and upon the death of his wife without issue of their marriage, as happened, then all of the income, subject to the charges thereon, should be paid in equal shares to his two daughters, and provided:

"from and after the death of either of my daughters: If she shall leave surviving children or issue of deceased children then I give devise and bequeath the share of my estate so limited in Trust for my said daughter so dying to my said Trustees in Trust for the use of her surviving children and issue of deceased children, per stirpes, to pay and apply the income in due proportion during the minority of each of such surviving children and issue of deceased children to their maintenance and education respectively: and when and as soon as each shall attain majority to grant assign, transfer and pay over the due share or proportion of the corpus so limited in Trust to him or her in fee simple and absolutely."

It is contended that while paragraph fifteenthly deferred *distribution of the principal* until the death of the survivor of the testator's widow and two daughters, the share of principal *vested* upon the death of a daughter leaving a child or issue. It is urged that this conclusion of vesting is strengthened by the absence of any provision for divestiture or gift over in the event such issue do not survive the expiration of the trust; the only gift over being in the event *all* of the said wife and daughters of testator die without leaving issue surviving: Brumbach Estate, 373 Pa. 302, 305, 306; Hope Estate, 398 Pa. 470; and Rickenbach Estate, 348

Pa. 121, 128, are cited in support of the conclusion that the portion in question has vested in the estate of Helen Steel Grayson.

Be that as it may, no part of the principal is now to be awarded out to any beneficiary. In view of the foregoing, I find that the one-fourth share of *income* is vested in the estate of Helen Steel Grayson, deceased. It will be so awarded, subject, nevertheless, as above.

2. *Stock dividends of six per cent*

In its notice of the further hearings the accountant notified the parties in interest of its proposal to allocate from principal to income certain receipts by it from several corporations, whose securities were held by the trust, of the shares of stock of the distributing corporation and rights to subscribe to shares of stock of the distributing corporation, to the extent of six percent or less, together with any subsequent dividends received on said shares as well as the proceeds of any such shares or rights as may have been sold, subject, nevertheless, to reimbursement to principal of any capital gains tax as may have been paid by principal with respect to such receipts, and subject to the allowance to accountant of compensation on the items so allocated to income.

The guardian-trustee ad litem, in his supplemental report, discusses and approves these proposed allocations to income as itemized in the schedule accompanying accountant's notice, a copy of which is hereto annexed, subject to reimbursing principal for the capital gains tax paid thereon. The recommendation by the guardian-trustee ad litem is adopted. The items listed in the accountant's proposal, here referred to, are allocated to income and will be reflected in the schedule of distribution hereinafter directed to be filed.

3. *E. I. du Pont distribution of General Motors Corporation stock.*

The undisputed facts establish that on July 13, 1962, the accountant received 300 shares of General Motors Corporation (hereinafter called "Motors") $1.67 par common stock as a "distribution" from E. I du Pont de Nemours & Company (hereinafter called "Du Pont"), on the 600 shares of the Du Pont stock theretofore held in the trust.

The accountant in its notice and the guardian-trustee ad litem in his supplemental report take the position that these 300 shares of Motors stock belong to principal. The deceased life tenant's estate claims these as income.

Catherwood Trust, 405 Pa. 61 (1961), reversing the rule laid down in Crawford Estate, 362 Pa. 458; Pew Trust, 362 Pa. 468; and Warden Trust, 382 Pa. 11, holds that the Principal and Income Act of 1947 now governs the allocation of receipts by a trust, even though the trust was created prior to the date of the act.

The Principal and Income Act of July 3, 1947, P. L. 1283, 20 PS §3470, et seq., as in effect on June 8, 1962, since amended, provided in part as follows:

"Section 3. Income and Principal; Disposition.

"(1) All receipts of money or other property, paid or delivered as rent of realty, or hire of personalty, or dividends on corporate shares, payable other than in shares of the corporation itself of the same kind and rank as the shares on which such dividend is paid, . . . shall be deemed income, unless otherwise expressly provided in this act.

"(2) All receipts of money or other property paid or delivered . . . in liquidation of the assets of a corporation, . . . shall be deemed principal unless otherwise expressly provided in this act. . ."

"Section 5. Corporate Dividends and Share Rights.

"(1) Subject to the provisions of this section all dividends payable otherwise than in such shares of

the corporation itself, including ordinary and extraordinary dividends and dividends payable in shares or other securities or obligations of corporations other than the declaring corporation, shall be deemed income. . .

"(3) Where the assets of a corporation are liquidated, wholly or partially, amounts paid upon corporate shares as cash dividends, declared before such liquidation began, or as arrears of cumulative preferred, or guaranteed dividends shall be deemed income, all other amounts paid upon corporate shares on disbursement of the corporate assets to the stockholders shall be deemed principal. All disbursements of corporate assets to the stockholders, whenever made, which are designated by the corporation as a return of capital or division of corporate property, shall be deemed principal . . ."

It is thus seen that section 3 of the act gives specific illustrations of what constitutes income and principal generally, while section 5 deals solely with cash and other forms of property which the trust receives from a corporation as a result of the trust's stock ownership. " 'Income' . . . means the return derived from principal", but "dividend" is not defined in the statute.

Section 2 of the act provides that the act "shall govern the ascertainment of income and principal" of a trust except where the person establishing the trust directs otherwise.

Item "Fifteenthly" of the will directs "that no distribution nor severance of any part of the corpus or principal of my estate be made by my Trustees until the death of the last survivor of my wife and daughters, the income only until that time to be applied distributed and paid over by my Trustees to those entitled. . . ."

The will makes no attempt to define "income".

The narrow issue here presented is whether the

shares of Motors received by the trust as a "distribution" from Du Pont is governed by section 5(1) or section 5(3) of the Principal and Income Act.

It is important to note that while section 5(1) of the act expressly provides that "extraordinary dividends and dividends payable in shares . . . of corporations other than the declaring corporation, shall be deemed income", that provision is in its forepart expressly made "Subject to the provisions of this section . . .", and not subject merely to the provisions of the subsection. It follows that the distribution by Du Pont of its shares of Motors stock, while at first blush falling within the language of subsection (1) of section 5, is nevertheless subject to all the provisions of subsection (3).

Subsection (3) of section 5, insofar as is here pertinent, provides that "All disbursements of corporate *assets* to the stockholders, whenever made, which are designated by the corporation as a return of capital or *division* of corporate property, shall be deemed principal." (Italics supplied.)

No one contends that the Motors stock here in issue was not an asset of the Du Pont Corporation. But the directors of the Du Pont Company, in their resolution directing the distribution, did not therein "designate" the distribution of the 23 million shares ordered to be distributed as "a return of capital" or "a division of corporate property" or a distribution by way of any other label or classification expressly mentioned in the act. We do note in passing, however, that by lexicographers' standards the directors' descriptive term of "distribution" falls short by a mere eyelash of providing the "open-sesame" to the statutory portal; for the noun "division" is authoritatively defined as the "act or process of dividing anything into parts, . . . distribution": Webster, New International Dictionary, 2d ed., 1959. The distribution to this trust should be

viewed, we believe, in the light of the relevant facts, none of which facts are in dispute.

Since the Principal and Income Act does not define "dividend", we must turn to case law for guidance:

"The word 'dividend', in its ordinary acceptation, means a distribution among the shareholders of a corporation of profits or surplus funds set apart by resolution of the board of directors in such manner as to be segregated from the property of the corporation and become the property of the shareholders. Ordinarily it means a sum set apart by the corporation from its profits to be divided among its shareholders. However, in its wider meaning, it is a portion of the principal or profits divided among the respective owners thereof": Carson v. Tompkins, 41 D. & C. 558, 569.

"The affairs of a corporation are managed by a board of directors, who, in the first instance, are to determine whether profits have been earned and whether, in their discretion, they ought to be divided among the shareholders; and, if such discretion is abused, the remedy for its correction is not to be found in an Orphans' Court.

*"Until a dividend of the profits of a corporation has been declared by its board of directors, a stockholder has no legal title to any interest in them.* The shares of stock which he holds represent only a right to participate in the profits, and that right is to be enforced ordinarily only after a dividend of the profits has been declared": Goetz's Estate (No. 1), 236 Pa. 630, 635. (Italics supplied.)

" 'A shareholder cannot ordinarily sue the corporation for his share of accumulated profits until a dividend has been declared, a matter which generally rests within the sound discretion of the directors, which discretion the courts will not control unless it has been plainly abused:' 10 Cyc. L. & Pr. 566": Corgan v. George F. Lee Coal Company, 218 Pa. 386, 390. Stand-

ard law digests and encyclopedias are to the same effect. See 18 C. J. S. pp. 1094, 1103, Corporations, §§458, 463; 13 Am. Jur., pp. 639-40, Corporations, §§645-46; 11 Fletcher Cyclopedia Corporations, Permanent Edition, 1958 Revised Volume, pp. 649, 653-658, sections 5319-5321; and 9 P. L. Encyc. 48-9, §173.

The significant rule to be drawn from the above is that a dividend is a *discretionary* act, or declaration, by the corporation's board of directors. The board's action must be voluntary. It cannot be dictated by a majority of the stockholders, or even by all of them: Monongahela Bridge Company v. Pittsburgh & Birmingham Traction Company, 196 Pa. 25; Long v. Rike, 50 F. 2d 124, cert. den. 284 U. S. 657. When the act of divestiture is dictated by a court of law, such distribution necessarily lacks an essential component of the accepted, ordinary definition of dividend.

Counsel for the parties have currently entered into a stipulation dated January 31, 196*3* [sic], which is hereto annexed. The stipulation recites that between the years of 1941 and 1948, inclusive, the trustee purchased in several lots a total of 150 shares of E. I. du Pont $20 par common stock at various prices for a resultant aggregate cost of $24,963.27; that on August 3, 1949, the accountant surrendered the 150 shares $20 par common for 600 shares $5 par common of E. I. du Pont, a four-for-one split, with an applicable account value of $24,963.27. When, on July 13, 1962, the accountant received from Du Pont the 300 shares of Motors common stock, it allocated a value of 47-11/16 per share, stock exchange value of Motors on July 9, 1962, to each of the 300 shares so received, a total of $14,306.25, and reduced the account value of the 600 shares of the Du Pont stock by an equal amount, i.e., from $24,963.27 to $10,657.02.

For some time prior to July 13, 1962, this trust already had 1,550 shares of General Motors Corporation

$1.67 par common stock held at an account value of $14,223.25. These 1,550 shares are not in controversy. However, these 1,550 shares of Motors stock carried at $14,223.25, and the 300 shares in controversy at an attributed account value of $14,306.25, as above, are reflected together in the current *principal balance* as 1,850 shares of General Motors Corporation $1.67 par common with an aggregate account value of $28,529.50. The 600 shares of Du Pont $5 par common stock appear in the current principal balance at an attributed account value of $10,657.02, as above, instead of $24,963.27, cost.

In separate memoranda, hereto annexed, counsel for the parties have agreed to certain other facts. They agree that by decree dated March 1, 1962, Judge Walter J. LaBuy entered an order in the United States District Court for the Northern District of Illinois which culminated 13 years of civil antitrust action by the U. S. Government against Du Pont and General Motors. The District Court decree, effective May 1, 1962, directed Du Pont to "divest itself" of all General Motors stock within 34 months.

The parties further agree that the board of directors of Du Pont at its meeting held May 31, 1962, adopted a resolution, a copy of which was admitted into evidence, reciting, that whereas the Du Pont Company, more than 40 years ago, acquired as an investment shares of stock of General Motors Corporation, which as a result of splits, stock dividends and exercise of rights, represent substantially all of the 63 million shares of General Motors now held by the company; that the 63 million shares were acquired at a book cost of $132,621,758, and are now carried on the Du Pont books at $1,266,300,000, of which $1,133,678,242, represents net additions to surplus as a result of revaluations in accordance with the practice followed by Du Pont since *1925*, under which the General Motors

common stock has been revalued annually to correspond to the equity in the balance sheet of Motors at December 31st of the preceding year. Further, and significantly, I believe, for the entire 40 years, Du Pont has treated its block of General Motors Corporation stock as an investment and as a part of its income-producing assets, and has consistently passed on to its stockholders *all of the dividends*, net of taxes, received on this investment; and whereas, the Congress of the United States by Public Law 87-403, enacted February 2, 1962, amended the Internal Revenue Code of 1954, so as to provide that a distribution of stock made pursuant to an order enforcing the antitrust laws shall not be treated as a "dividend distribution" but shall be treated as "a return of capital", and whereas the United States District Court had ordered the company to divest its holdings as above, the board of directors adopted a resolution reading in part as follows:

"NOW, THEREFORE, BE IT RESOLVED, that a distribution hereby is directed on the outstanding common stock of this Company payable July 9, 1962 to stockholders of record as shown on the books of the Company at the close of business on June 8, 1962, said distribution for each share of Du Pont common stock to be one-half of a share of General Motors Corporation common stock; . . .

"RESOLVED FURTHER, that the shares of General Motors Corporation common stock to be used for this distribution be selected by the Finance Committee;

"RESOLVED FURTHER, that the portion of the book-carrying value representing the cost of the General Motors Corporation common stock distributed shall be charged against Paid-In Surplus on the Company's books and the balance shall be charged against Surplus Arising from Revaluation of Security Investments on the Company's books; . . ."

The financial notes to Du Pont's annual report for 1962, pp. 34-5, reveal that the primary charge against "Paid-In Surplus" of $21,694,964 represented the original cost of the motors shares, while the balance charged against "Surplus Arising from Revaluation of Security Investments" was $440,434,025, or about 95.3 percent of the total distribution. Earned surplus was not touched.

The parties have further agreed that Du Pont's original investment in General Motors Corporation common stock was made in 1918 and 1919. As a result of a three-for-one split by General Motors of its common stock in 1961, the original 20 million shares of General Motors $5 par common held by Du Pont became 60 million shares of $1.67 par common. In 1955, Du Pont acquired one million shares of General Motors Corporation $5 par common, as a result of an exercise of rights offering by General Motors. In 1961, in the three-for-one split, these one million shares became three million. So that at the time of the order by the District Court, Du Pont owned 63 million shares of General Motors common as above. Finally, after distribution by Du Pont of its Motors stock pursuant to its resolution of May 31, 1962, there remained 40 odd million shares of Motors common stock to be distributed pursuant to the District Court order.

The acquisition by Du Pont of its investment in Motors common stock was never earmarked or allocated by Du Pont to its capital account, or to any of its specific surplus accounts. It is part of the record by agreement of counsel that "[s]ince the general funds of the [Du Pont] Company never have been segregated as to those derived from capital funds, paid-in surplus, or surplus earnings, it is not possible to associate the funds used to purchase the GM stock with specific parts of [Du Pont's] capitalization structure."

Inability of the life tenants to establish that Du Pont had voluntarily earmarked the Motors stock as profits for distribution to its stockholders would have lost them their claim to the distribution as income under the former Pennsylvania Rule of Apportionment: Cunningham Estate, 395 Pa. 1, 12, 13.

The parties also have agreed that, consistent with the customary anticipatory reaction of the exchange, the market value of Du Pont common at the close of business on June 4, 1962, was 209¼ "with dividend", and 182½ the next day, "ex-dividend".

It is important to note from the admitted facts, that Du Pont's investment in General Motors Corporation prior to the divestiture order comprised almost 25 percent of Du Pont's assets; that annually Du Pont paid out to its stockholders, including this trust, all of the net General Motors' dividends which it received; that this *trust's equity* in Du Pont has been diminished in this account, as such, by its dilution or distribution of Motors stock to which stock the difference has been attributed; that when this trust first acquired its interest in Du Pont in 1941, Du Pont already owned substantial investments in General Motors, which investments on its books then reflected "enhanced" values of Motors; that the distribution by Du Pont of its substantial investment in General Motors is not voluntary, but involuntary; was not in lieu of Du Pont's regular cash dividends; and is not based on current earnings or earnings by Du Pont over any fixed period, but on the contrary, is plainly without regard to Du Pont's earnings. This distribution directed by the District Court as a *divestment* of the *asset,* called a "spin-off" by some writers, is as much a partial liquidation of the assets of the corporation, within the purview of subsection (3) of section 5 of the Principal and Income Act, as if the directors of the corporation had so designated the distribution.

If, for example, this trust had made an investment in Du Pont common stock after the resolution of May 31, 1962, by Du Pont's Board of Directors and prior to the record date, is there any question but that the distribution would be a return of capital for all purposes? Certainly not.

Professor Scott in his 1963 Supplement to his authoritative treatise on Trusts, §236.5, states the rule:

"Where a corporation is directed by public authority to cease to hold shares of a subsidiary corporation, and it distributes such shares among its shareholders, such distribution may be held to be in the nature of a partial liquidation and allocable to principal." See also the comment to the Restatement of Trusts 2d, §236 (e).

While it may well be contended that General Motors was never a subsidiary of Du Pont, it cannot be gainsaid that implicit in the order of the District Court is the judicial finding that the control vested in Du Pont was akin to that which the latter corporation could, or might, have exercised over a subsidiary. Hence the reasoning of the restatement and Professor Scott is fully applicable to the current distribution.

Counsel for the life tenant scoffs at the thought of any so-called "liquidation" because both Du Pont and General Motors are thrivingly in business and will doubtless continue long after complete divestiture of Motors stock. Agreed that he is correct as to the companies' continuance, but the fact remains that Du Pont will eventually "wind up" all its control of General Motors by way of stock ownership, and thereby will have completely "liquidated" a major portion of its business as a holding company. One cannot overlook the fact that a cut in Du Pont's yearly dividend rate appears inevitable, because in every year since 1941, with the single exception of 1945, the cash dividends to its shareholders have greatly exceeded its net income

from Du Pont sources. Du Pont shareholders who retain their Motors stock, however, will have an improved income position because they will receive their General Motors dividends without the tax deduction heretofore subtracted by Du Pont. For the Steel trustees to convey the Motors stock to the life tenants in addition to this increased income would be nothing less than a windfall, entirely unwarranted on this record.

The instant matter appears to be one of first impression under the Principal and Income Act in this jurisdiction. Cases prior to Catherwood, such as Barnes' Estate, 338 Pa. 555, held that extraordinary dividends, including distributions of corporate stock of corporations other than that of the distributing corporation, were apportionable under the Pennsylvania Rule between principal and income, depending on the "intact value" retained in principal and the "retained earnings" of the distributing corporation during the period of the trust's investment. Under the Principal and Income Act these considerations, "intact value" and "retained earnings", are no longer significant.

Earlier cases in other jurisdictions involving similar forced distributions have resulted in conflicting decisions as pointed out in a comprehensive article in Fiduciary Review for August, 1962. Thus, Koehler v. Koehler, 99 N. J. Eq. 141, 132 Atl. 751, 754, involved the 1911 Standard Oil divestiture. The New Jersey court held that the stock of the subsidiary companies so distributed should be retained in the principal of the trust. The court stated that "[t]he investment remained practically the same. The only difference being that, instead of owning 100 shares of one company, the estate now owns an equivalent amount of shares in several companies." A similar holding followed in New York: In Re Bank of New York & Fifth Avenue Bank, 105 N. Y. S. 2d 211; modified in other respects, sub nom., In Re Matthews' Trust, 280 App. Div. 23, 111

N. Y. S. 2d 405, aff'd. mem., 305 N. Y. 605, 111 N. E. 2d 731. Massachusetts is contra.

Several of the States have by recent legislation expressly provided that the judicially forced distribution by a corporation of the shares of another corporation shall be deemed principal: Florida Stats. Ann. §690.06, as amended 1961; Illinois, 30 Ill. Anno. St. §164, as amended 1961; Maryland Ann. Code 1957, article 75B, §5, as amended 1962; New York, Personal Property Law, §17-a6, as added 1963; Wisconsin, 27 W. S. A. §231.40(5)(a), as amended 1961. The New York statute provides that:

"6. When a corporation . . . is being wholly or partially liquidated, shares of stock and cash or other assets distributed to stockholders are principal. . . For the purposes of this section, a corporation . . . is in liquidation . . . if the corporation . . . is making a distribution of assets other than cash pursuant to a court decree or final administrative order by a government agency ordering the distribution of the particular assets. . ."

In urging the distribution of the General Motors stock to income, counsel for the life tenants argues (1) if Du Pont had sold the shares of General Motors' stock and ordered the distribution of the proceeds, the proceeds would be distributable to income and (2) the Massachusetts cases, viz., Smith v. Cotting, 231 Mass. 42, 120 N. E. 177, and Old Colony Trust Co. v. Aymar, 317 Mass. 66, 56 N. E. 2d 889, which support a distribution to income, should guide this court as precedents.

We are here not concerned with the possibility that the directors of Du Pont might have directed the sale of its shares of Motors stock or the distribution that they then might have made of the proceeds following such sale. For our purposes it is sufficient that the distribution was made not from earned surplus, but from

paid-in surplus and surplus arising from revaluation of security investments.

Insofar as the two cited Massachusetts cases are concerned, it is interesting to note that Massachusetts passed an emergency law especially relating to Du Pont on May 24, 1962, Ch. 481, 6A Ann. Laws, c 203, §21 A, which refers to Du Pont by name and says that distribution of the shares of another corporation is not necessarily income if the trustee "determines that this section would be unjust or inequitable", whereupon the trustee may distribute the shares as income or principal or in such proportion as he "deems just and equitable." To this significant extent the Massachusetts legislature has expressed its opinion that the statute as previously construed did sometimes work inequity, and that it would be wrong to approach the present problem with the rigidity of the past.

I see no necessity for any statutory change in the Pennsylvania Principal and Income Act to reach the result which the legislatures in the other States have declared desirable. The present language requires a construction that the Du Pont distribution belongs in principal, and admits of no alternative. I hold that the accountant has properly charged itself with the 300 Motors shares as principal, and should retain the same in its principal account. . . .

And now, March 11, 1964, the account is confirmed nisi.