## Anthony Estate.

402

Argued January 6, 1966. Before BELL, C.J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*John T. Pfeiffer, III,* with him *John B. McGurl* and *Ronald J. Ulmer,* for appellant.

*Robert M. Zimmerman,* with him *Guy E. Waltman* and *E. Mac Troutman,* for appellees.

*Paul Maloney* and *Ernest Scott,* and *Pepper, Hamilton & Scheetz,* filed a brief under Rule 65.

*Thomas N. Griggs,* and *Griggs, Moreland, Blair & Douglass,* filed a brief under Rule 65.

OPINION BY MR. JUSTICE ROBERTS, November 15, 1966:

The single question presented on this appeal is , whether 900 shares of General Motors common stock

distributed by E. I. duPont deNemours and Company pursuant to an anti-trust divestiture decree shall be allocated by the trustees of a testamentary trust to corpus or income. The court below, relying on §5(3) of the Principal and Income Act of 1947,[1] entered a decree nisi confirming an allocation of the shares to principal. Exceptions taken by the life tenant were dismissed and a final decree entered.[2] This appeal followed.

Thomas J. Anthony, a resident and domiciliary of this Commonwealth, died testate on February 26, 1934. In his will, testator devised and bequeathed the whole of his residuary estate in trust, directing that the income be paid to his wife, Sadie Rohrer Anthony, for life, and the principal, at her death, to certain named beneficiaries. Included within decedent's residuary estate, and, subsequently conveyed into trust, were 450 shares of common stock of E. I. duPont deNemours and

---

[1] Act of July 3, 1947, P. L. 1283, §§1-15, as amended by the Act of August 1, 1963, P. L. 442, 20 P.S. §§3470.1-3470.15. Section 5(3) provides: "Where the assets of a corporation are liquidated, wholly or partially, amounts paid upon corporate shares as cash dividends, declared before such liquidation began, or as arrears of cumulative preferred, or guaranteed dividends shall be deemed income, all other amounts paid upon corporate shares on disbursement of the corporate assets to the stockholders shall be deemed principal. All disbursements of corporate assets to the stockholders, whenever made, which are designated by the corporation as a return of capital or division of corporate property, shall be deemed principal. . . ." Act of July 3, 1947, P. L. 1283, 20 P.S. §3470.5. See also §§3(2) and 3(3), which operate to allocate "principal" to the remainder interest. Act of July 3, 1947, P. L. 1283, 20 P.S. §§3470.3(2), 3470.3(3). The court below, in allocating the instant distribution to principal on the basis of §5(3), appears from its opinion to have held that the distribution was designated by duPont as "a return of capital," and, alternatively, one made in partial liquidation.

[2] The same result was reached in Austin Estate, 38 Pa. D. & C. 2d 79 (Orphans' Ct. Montgomery Co. 1965), and Steel Estate, 32 Pa. D. & C. 2d 553 (Orphans' Ct. Phila. Co. (1964)).

Company, which shares, as the result of a stock split have increased to 1800. On the basis of these holdings, the trust received, on July 9, 1962, the distribution here in dispute.

The background and circumstances of the duPont-General Motors distribution are sufficiently known to make a detailed review of those events unnecessary.[3] It suffices for present purposes to note that as a result of the successful prosecution of an anti-trust action instituted against duPont, on March 1, 1962, 63,000,000 shares of General Motors, acquired over a period dating back to 1917, and constituting almost 25% of the assets of duPont, were ordered divested. *United States v. E. I. duPont deNemours & Co.*, 366 U.S. 316, 81 S. Ct. 1243 (1961). In accordance with the options permitted duPont, compliance with the divestiture decree was had through the distribution of the shares to duPont shareholders.[4] Although only 900 shares are here in issue, the Anthony trust ultimately received, as its pro rata share of the distribution, 2448 shares of General Motors.[5]

Both parties concede that the allocation of the distribution, whether to the income cestui or to corpus,

---

[3] A full account may be found in the decisions of the anti-trust proceedings. See *United States v. E. I. duPont deNemours & Co.*, 126 F. Supp. 235 (N.D. Ill. 1954), reversed and remanded, 353 U.S. 586, 77 S. Ct. 872 (1957), on remand, 177 F. Supp. 1 (N.D. Ill. 1959), vacated in part and remanded, 366 U.S. 316, 81 S. Ct. 1243 (1961). See also *Steel Estate*, 32 Pa. D. & C. 2d 553 (Orphans' Ct. Phila. Co. (1964)).

[4] The final judgment and decree permitted duPont to complete the divestiture either by a distribution to its shareholders or by such other means as it considered appropriate. *United States v. E. I. duPont deNemours & Co.*, United States District Court for the Northern District of Illinois, No. 49 C 1071 (March 1, 1962) (unreported).

[5] The trustee received 900 shares of General Motors on July 9, 1962, 548 shares on January 6, 1964, and 900 shares on January 4, 1965. Only the distribution received on July 9, 1962 was received within the period covered by the present accounting.

is to be controlled by the Principal and Income Act of 1947;[6] they differ only as to the applicable provision.[7] Appellant, the life tenant, contends that the distribution constituted a dividend payable in shares of a corporation other than the distributing corporation and is thus allocable under §5(1) to income.[8] Appellees, the remaindermen, dispute the characterization of the distribution as a *dividend*, and, a fortiori, the applicability of the provision upon which appellant relies. Moreover, they urge that the distribution was designated by duPont as a "return of capital," and, as a result, is allocable under §5(3) to principal.[9] Alternatively, they ask that we construe that provision of §5(3) which directs the allocation of corporate assets distributed in partial liquidation to principal[10] to include, given the magnitude and circumstances of General Motors distribution, the instant transaction. In

---

[6] The validity of §15, applying the Act to pre-existing trusts is not questioned. Act of July 3, 1947, P. L. 1283, 20 P.S. §3470.15; see *Norvell Estate*, 415 Pa. 427, 203 A. 2d 538 (1964); *Catherwood Trust*, 405 Pa. 61, 173 A. 2d 86 (1961).

[7] Mr. Anthony's will contained no express provision governing the allocation and apportionment of income and principal; thus, the settlor's paramount power of direction, recognized by §2, Act of July 3, 1947, P. L. 1283, 20 P.S. §3470.2, is not here involved.

[8] The relevant portions of §5(1) are as follows: "Except as provided . . . in other subsections of this section all dividends payable otherwise than in shares of the distributing corporation, including ordinary and extraordinary cash dividends and *dividends payable in shares or other securities or obligations of corporations other than the distributing corporation*, shall be deemed income." (Emphasis supplied.) Act of July 3, 1947, P. L. 1283, as amended, 20 P.S. §3470.5(1). "Income," is allocated by §3(3) to the tenant, see Act of July 3, 1947, P. L. 1283, 20 P.S. §3470.3(3), "the person to whom income is presently or currently payable [under the trust instrument] . . . ." Act of July 3, 1947, P. L. 1283, §1, 20 P.S. §3470.1.

[9] See note 1, supra.

[10] Ibid.

either case, they urge, assuming arguendo the correctness of appellant's characterization of the distribution, §5(3) would nevertheless be controlling.

At the outset, it should be noted that the Principal and Income Act of 1947 does not explicitly provide for corporate distributions in compliance with divestiture decrees. While such distributions may fairly be described as extraordinary, they are not, as the celebrated 1911 Standard Oil divestiture establishes, unprecedented.[11] Yet, the Uniform Principal and Income Act,[12] upon which the Principal and Income Act of 1947, and its predecessor, the Principal and Income Act of 1945,[13] were based, did not as originally adopted, anticipate or deal with the allocation problem presented under such circumstances. Subsequently, the Uniform Act was amended and in its revised form

[11] See, e.g., *Koehler v. Koehler*, 99 N.J. Eq. 141, 132 Atl. 751 (1926); *United States Trust Co. v. Heye*, 224 N.Y. 242, 120 N.E. 645 (1918). The cases have gone both ways. Fiduciary Review, Principal and Income—duPont Distribution of General Motors Shares 4 (August 1962); see generally Notes, Trust Allocation of Dividends in Securities of Non-Declaring . Corporations—Massachusetts and New York, 43 B.U.L. Rev. 303, 307-10 (1963). Cf. *Old Colony Trust Co. v. Aymar*, 317 Mass. 66, 56 N.E. 2d 889 (1944); *Old Colony Trust Co. v. Jameson*, 256 Mass. 179, 152 N.E. 2d (1926); *Smith v. Cotting*, 231 Mass. 42, 120 N.E. 177 (1918); *In re Conway*, 29 N.J. Super. 598, 103 A. 2d 57 (1954); *In re Bank of New York & Fifth Ave. Bank*, 105 N.Y.S. 2d 211 (1951), mod. in other respects sub. nom. *Matter of Matthews*, 280 App. Div. 23, 111 N.Y.S. 2d 405 (1952), aff'd mem., 305 N.Y. 605, 111 N.E. 2d 731 (1953).

[12] Drafted for the Commissioners on Uniform State Laws by Judge Charles E. Clark, the Act was approved for submission to the states in 1931. The Act and its subsequent revision, the Revised Uniform Act, have been adopted in nearly half of the states, although with frequent modification. See Bogert, Trusts and Trustees, §802 (Supp. 1965).

[13] Act of May 3, 1945, P. L. 416, 20 P.S. §§3471-3485, superseded by the Act of 1947.

provides specific treatment for divestiture distributions.[14] Our Act, however, remains silent on the subject.

Yet, in the face of the clear language of §2 that the Act was intended "[to] govern the ascertainment of income and principal and the apportionment of receipts and expenses between tenants and remaindermen in all cases where a principal has been established with, or, unless otherwise stated hereinafter, without the interposition of a trust," Act of July 3, 1947, P.L. 1283, 20 P.S. §3470.2, we would be reluctant to conclude that resort to a nonstatutory rule is here required. Especially is this the case where the background and history of the legislation makes abundantly clear the Legislature's intent to displace our former rules of apportionment. While designed to insure equitable treatment of the various interests in a trust corpus, experience has demonstrated how easily the purpose of those rules was confounded by the complexity of modern corporate finance and accounting. See *Catherwood Trust*, 405 Pa. 61, 173 A. 2d 86 (1961) ; *Norvell Estate*, 415 Pa. 427 203 A. 2d 538 (1964) ;

---

[14] The Revised Uniform Act was approved by the National Conference of Commissioners on Uniform State Laws in August 1962. See Bogert, Trusts and Trustees, §816 (Supp. 1965). Section 6 provides, in part: "(b) Except to the extent that the corporation indicates that some part of a corporate distribution is a settlement of preferred or guaranteed dividends accrued since the trustee became a stockholder or is in lieu of an ordinary cash dividend, a corporate distribution is principal if the distribution is pursuant to . . . (3) a total or partial liquidation of the corporation, including any distribution which the corporation indicates is a distribution in total or partial liquidation or any distribution of assets, other than cash, pursuant to a court decree or final administrative order by a government agency ordering distribution of the particular assets." Revised Uniform Principal and Income Act, §6(b)(3).

408

*Cunningham Estate,* 395 Pa. 1, 149 A. 2d 72 (1959).[15]
While the Act is not explicit on the subject, we have
no doubt that the purpose and intent of the Legisla-
ture would be frustrated were we to refuse to be guided,
in the resolution of the question here presented, by the
Act. Accordingly, the responsibility devolves upon
this Court to apply that provision which will further
the legislative design of the Act. In our view, the
application of §5(3) and the allocation of the distri-
bution to corpus will most satisfactorily accomplish
that end.

When considered against the background of the
Uniform Act, the progenitor of our statute, appellant's
contention that the distribution be allocated to income

---

[15] In *Cunningham Estate,* 395 Pa. 1, 11, 149 A. 2d 72, 78 (1959),
we stated: "The complexities, the uncertainties, and the difficulties
which are inherent in the application and administration of the
Rule have too often in these modern times created confusion, in-
justices and glaring inconsistencies. The essential fairness and eq-
uity of the Pennsylvania Rule was beyond question. The basis for
its rejection and abandonment by legislation is the fact that
changes in corporate practice have, in many instances, rendered
unworkable the Rule. In recent years the ingenuity of corporate
management, seeking to achieve various ends such as broadening
or enhancing the market for its stock, effect tax savings, etc., has
produced a complexity of corporate transactions . . . . Earnings,
under modern corporate practice, no longer retain the simplicity of
meaning of the earnings considered by this Court in Earp's Ap-
peal, supra, and other decisions." See also *In re Arens,* 41 N.J.
364, 197 A. 2d 1 (1964) ; Cohan & Dean, Legal, Tax and Accounting
Aspects of Fiduciary Apportionment of Stock Proceeds—The Non-
Statutory Pennsylvania Rules, 106 U. Pa. L. Rev. 157, 205-06
(1957) ; Flickinger, A Trustee's Nightmare: Allocation of Stock
Dividends Between Income and Principal, 43 B.U.L. Rev. 199
(1963) ; Niles, Fosdick, Cunningham & Chaos, Ways Out of the Ap-
portionment Dilemma, 98 Trusts & Estates 924 (1959) ; Notes, Mr.
Nirdlinger, Meet the New Economy, 64 Dick. L. Rev. 247 (1960) ;
cf. Krasnowiecki, Existing Rules of Trust Administration: A
Stranglehold on the Trustee-Controlled Business Enterprise, 110 U.
Pa. L. Rev. 506, 816 (1962).

finds little support. To the contrary, that background suggests the thesis that the draftsmen of the Uniform Act, rejecting the view that undistributed earned surplus be equated with "income" for trust purposes, adopted the policy that nothing be deemed income which is not the result of a decision by management, freely arrived at, to distribute the "earnings" of the corporation.[16] Thus, they sought to restate, by generalizing as to traditional corporate practices, those distributions which are presumptively the result of such a decision. These distributions are allocated to the income cestui. All other distributions, including those designated by the directorate as "a return of capital or a division of corporate property," are allocated to principal. Our statute, following the Uniform Act, reflects the same basic design.[17]

[16] See Clark, Interpretation of the Proposed Uniform Principal and Income Act, 54 Trust Companies 723 (1932), setting forth the policy of the Act that the judgment of the corporation as to what is income and what is capital is a more reliable basis for decision than reliance on financial statements prepared for a diversity of corporate purposes. See also Staver, The Uniform Principal and Income Act, 21 Ore. L. Rev. 217 (1942). Staver points out that the Massachusetts rule, upon which the Uniform Act was modeled, "relies on the form of the dividend rather than its source, for the determination of the rights of the tenant and remainderman. In effect, it adopts the judgment of the directors of the corporation, as to what shall be distributed and what retained, by treating as income all cash dividends, and as principal all distributions of stock representing assets appropriated by the corporation as an increase in capital." Id. at 232. See *Minot v. Paine*, 99 Mass. 101 (1868), the leading case under the so-called Massachusetts Rule.

[17] For example, cash dividends, normally the result of a corporate decision to distribute earnings, are allocable to income. See Act of July 3, 1947, P. L. 1283, §5(1), as amended, 20 P.S. §3470.5 (1). Distributions of shares in the declaring corporation, most usually the result of a decision to retain earnings for corporate purposes, are, subject to the 6% rule, allocated to principal. See ibid. The common feature of distributions in corporate assets, as distinguished from stock dividends, is that the corporate assets and

410

In the face of the underlying policy of our Act, we are unable to conclude that a distribution of almost 25% of the assets of duPont, dictated by external circumstances rather than by a decision of duPont's directorate, constitutes a *dividend* allocable to income. Moreover, even were we to concede the correctness of appellant's characterization of the distribution as a dividend, we would not dispose of the claims of the remaindermen to the distribution, since the provision of §5(1) upon which appellant relies is expressly made subject to displacement by §5(3),[18] when applicable, which operates to allocate the shares to corpus. It is necessary, therefore, that we turn to a consideration of §5(3).

While we are of the view that §5(3) of the Act compels the allocation of the General Motors shares to principal, we do not base our conclusion on the ground advanced by appellees that the distribution has been designated by duPont as "a return of capital" within the meaning of the Act. As we view the documents upon which appellees rely,[19] they are concerned

net worth are diminished by the amount of the distribution. Notes, Trust Allocation of Dividends in Securities of Non-Declaring Corporations—Massachusetts and New York, 43 B.U.L. Rev. 303, 305 (1963). Although book value per share is diminished by the amount of the distribution, each share of stock continues to represent the same proportionate interest in the corporation. Ibid. Such distributions may represent either income or a liquidating distribution. Ibid. Therefore, dividends in shares of a corporation other than the distributing corporation, presumptively income, are allocated to the income beneficiary, see Act of July 3, 1947, P. L. 1283, §5(1), as amended, 20 P.S. §3470.5(1), except where the circumstances favor the conclusion that the distribution is being made in liquidation. See Act of July 3, 1947, P. L. 1283, §5(3), 20 P.S. §3470.5(3).

[18] See note 8, supra.

[19] Specifically, appellees point to a resolution of the Board of Directors of E. I. duPont deNemours & Co., Inc., adopted May 31, 1962; a letter to the shareholders of duPont, dated May 31, 1962; and a letter to the holders of duPont common stock, dated July 9, 1962.

exclusively with matters of federal taxation, intended merely to advise duPont shareholders of the tax consequences of the distribution. Nothing contained in these documents is expressive of duPont corporate policy with regard to the distribution, and, thus, the communications do not suffice to control the instant allocation. However, appellees' alternative argument, treating the distribution as one made in partial liquidation within the meaning of §5(3), corresponds to our view of the transaction and represents the position which we adopt.

In reaching this conclusion, we are not unmindful of the fact that duPont, both prior and subsequent to the distribution, was and continues to be a thriving business. Moreover, we are cognizant of the fact that no liquidation was technically effected under Delaware law, the state of duPont's incorporation. Nevertheless, as pointed out by the court in *Steel Estate*, 32 Pa. D. & C. 2d 553 (Orphans' Ct. Phila. Co. 1964), the fact remains that duPont has distributed a substantial percentage of its assets and "thereby . . . 'liquidated' a major portion of its business as a holding company." Id. at 567-68. As a result, neither the dividends derived from its General Motors holdings nor the capital represented by its investment in those shares will be available to duPont to supplement its earnings from its own sources. See ibid. And, where sums of the magnitude of those here distributed are involved, a characterization of the distribution as one made in partial liquidation is strongly suggested, if not compelled.

Although not dispositive of our Act, it is instructive to note that the comment to §236(e) of the Restatement 2d, Trusts, which allocates all distributions made in total or partial liquidation other than "amounts paid as cash dividends declared before such liquidation occurred or as arrears of preferred or guaranteed divi-

dends" to principal, adopts the view that the distribution of shares of a subsidiary corporation, directed by a public authority, "may be in the nature of a partial liquidation and allocable to principal." This is the position taken by Scott in his treatise on trusts. 3 Scott, Trusts §236.5 (Supp. 1966). While General Motors was not a subsidiary of duPont, the rationale and policy of the rule advanced by the Restatement and Scott would appear, nevertheless, to apply. Fiduciary Review, Principal and Income—duPont Distribution of General Motors Shares 4 (August 1962). Moreover, by recent legislation, several other jurisdictions have required the allocation of a distribution made under such circumstances to corpus.[20]

Given the fact that the Revised Uniform Act and the Restatement reflect the considered judgment of scholars and practitioners knowledgeable in this area of the law, their treatment and allocation of judicially dictated distributions to principal is entitled to great weight. While not dispositive of the intent of our Legislature in enacting the Act of 1947, the positions taken by the Restatement and Revised Uniform Act do support the conclusion that a characterization of the duPont distribution as one made in partial liquida-

[20] Idaho, Idaho Stat. §68-1006(b)(3) (Supp. 1965); Kansas, Kan. Stat. §58-905(b)(3) (Supp. 1965); Louisiana, La. R.S. §9.2149(B)(3) (1965); Michigan, Mich. Stat. §26.79(6)(b)(3) (Supp. 1965); and Wyoming, Wyo. Stat. §34-379(b)(iii) (Supp. 1965), have adopted the Revised Uniform Principal and Income Act, which, as has been noted, allocates divestiture distributions to principal. See note 14, supra. Colo. Rev. Stat. §57-4-5 was amended to the effect that distributions of securities in a corporation other than the distributing corporation pursuant to an order of a court or administrative agency are allocable to principal unless the distributing corporation designates the distribution as one wholly or partly in lieu of an ordinary cash dividend. To the same effect is the recent amendment of §231.40(5)(a) of Wis. Gen. Laws (1963).

tion does not violate accepted convention. Moreover, such views confirm our conclusion that the duPont-General Motors distribution sufficiently approximates in economic effect a distribution in partial liquidation to justify its inclusion in that category of our Act and its allocation to principal.

We think it worth noting, that a contrary conclusion .would have particularly untoward effects on the corpus of trusts receiving the duPont distribution. Beyond the depreciation in the value of the duPont holdings,[21] extreme because of the magnitude of the distribution, the tax consequences would be particularly exacerbating. As a result of special legislation, the General Motors shares distributed are entitled to be treated by non-corporate shareholders as a return of capital for federal income tax purposes. Int. Rev. Code of 1954, §1111; see 5 CCH 1966 Stand. Fed. Tax Rep. ¶4699A-4699E.15. However, such treatment requires that the basis of the duPont shares held by the stockholder be reduced by the market value of the General Motors shares received. Int. Rev. Code of 1954, §301(c)(2); see 5 CCH 1966 Stand. Fed. Tax Rep. ¶4699E. Therefore, upon the sale of those securities, the sum received in excess of the new, reduced basis will be subject to capital gains taxation and the proceeds, allocable to principal, reduced accordingly. It is clear, therefore, that the corpus will be taxed, in part, on sums which have been diverted to the life tenant. In addition, in those cases in which the basis of the duPont hold-

---

[21] As of December 31, 1961, duPont carried General Motors stock on their books at $1,222,200,000. Of the 63,000,000 shares held, 23,000,000, approximately 36%, were distributed on July 9, 1962 to shareholders of record as of June 8, 1962. Standard & Poor, Corporation Records 5873, 6307 (1962). On June 4, 1962, the closing market price of duPont was $209¼; on June 5, 1962, the price had declined to $182½. Wall Street Journal, June 5, 1962, p. 30; June 6, 1962, p. 28.

ings are exceeded by the value of the General Motors shares received, the trust, merely by reason of its receipt of the latter shares, even though allocated to income, will have incurred taxable capital gains. Int. Rev. Code of 1954, §301(c)(3)(A); see 5 CCH 1966 Stand. Fed. Tax Rep. ¶4699E.10. Thus, significant burdens will be incurred by the corpus were the General Motors shares not available to offset the tax consequences of the transaction.

To substantial numbers of shareholders in duPont, those acquiring their holdings subsequent to the acquisition of the General Motors shares duPont's investment in General Motors represented capital, and, the appreciation in value of those shares, capital appreciation. To others, those acquiring duPont prior to the acquisition of its General Motors holdings, those holdings may be viewed as deferred income, appreciated in value through duPont's investment of previously earned surplus in General Motors. While the application of our common law rule of apportionment would make such matters, in part, dispositive, the enactment of the Principal and Income Act precludes reference to such considerations. The need for administrative convenience and the limitations of our former rule have led the Legislature to invoke rules of general application, which, by necessity, may not do perfect justice. Yet, on balance, we are of the view that the distribution of the General Motors shares to corpus will, in most instances, most equitably treat the successive interests in the trust. In this fashion, substantial losses to the sole detriment of remaindermen will be avoided; while income cestuis will continue to be the beneficiaries of the income produced and distributed by General Motors.

Decree affirmed. Each party to pay own costs.

CONCURRING OPINION BY MR. JUSTICE COHEN:

The legislature, when it passed the Act of July 3, 1947, P. L. 1283, 20 P.S. §3470.1 et seq., never contemplated a situation such as the one with which we are now confronted and made no provision for the application of the Act to this problem. Thus we should not apply the Act to this situation and be required, as the majority does, to make a choice between the provisions of §5(1) or §5(3), since neither of those sections nor any other section of the Act was within the contemplation of the legislature, applicable to the duPont situation.

Several states have been more realistic and with a greater degree of probity have by recent legislation expressly provided that a court forced distribution by a corporation of the shares of another corporation shall be deemed principal. Florida, Illinois, Maryland and Wisconsin had statutory enactments relating to the distribution of principal and income, but have recognized the uniqueness of this situation and the lack of their applicable statutory guides and provided the solution by additional statutory enactment.

The Pennsylvania legislature did not so act; thus the situation presented by this problem has no statutory solution in Pennsylvania and any attempt to distinguish and apply various sections of our existing Principal and Income Act to provide a statutory solution to this situation is nothing more than tortuous rationalization. In fact, the majority's determination made without guidelines may prove to be a dangerous precedent.

Thus, I would disregard all of our existing statutory enactments and base my conclusion solely on the concept that a contrary determination would be most inequitable to the remaindermen of the trust and not within the settlor's contemplation.