## Greenfield Estate

Before Klein, A. J., Bolger, Saylor, Shoyer, Pawelec and Silverstein, JJ.

SAYLOR, J., January 26, 1973—The residuary trustee, Provident National Bank, and Carlotta G. Howard and Nina Allen, beneficiaries of the residuary trust, have filed exceptions to the award by the learned auditing judge to the Philadelphia Museum of Art of paintings, title to which was held by Elizabeth Realty Company, of which testator was the majority stockholder.

Albert M. Greenfield was an able businessman and a distinguished citizen who amassed a large fortune consisting of securities, real estate and objects of art. He left a will prepared by legal counsel and consisting of 48 pages in which he made gifts outright and in trust to his wife and his children and grandchildren and created a residuary trust.

Paragraph Sixth c of the will provides as follows:

"I give and bequeath to my sons, Gordon K. Greenfield and Albert M. Greenfield, Jr., or the survivor of them, the use for life of such of my prints, etchings, drawings, paintings and sculpture, and any other

works of art, as were acquired prior to my marriage to my wife, Elizabeth M. Greenfield; and I give and bequeath to my wife the use for life of such of my prints, etchings, drawings, paintings and sculpture, and any other works of art, as were acquired during our marriage . . . and at the death of my wife . . . the items so bequeathed shall pass to the Philadelphia Museum of Art, etc.

We are concerned here solely with the works of art acquired during decedent's marriage with Elizabeth. At his death, decedent held title to such items appraised and inventoried at $108,470. He likewise owned 96 percent of the stock of Elizabeth Realty Company, his wife owning the remaining 4 percent. That corporation held title to paintings appraised at $338,950.

The matter to be decided by the court is whether in using the phrase "my prints, etchings, drawings, paintings and sculpture," testator by his will disposed of such objects of art title to which lay not in him but in a corporation over which he obviously exercised dominion and control.

As Mrs. Greenfield has filed an election to take against the will, the gift of the life interest to her in the etchings and paintings and other objects of art became inoperative and the gift of them to the Philadelphia Museum of Art was accelerated. The award by the auditing judge followed.

The sole issue for the court to decide, therefore, is whether the award of what for convenience has been designated "my paintings" is in conformity with the terms of the will.

Was there an ambiguity in the will? Did the auditing judge properly allow the introduction of oral testimony to establish the intent of the testator in the use of the words "my paintings," and was such testimony effec-

tive in broadening the interpretation of such words to include objects of art to which testator did not hold title?

It is agreed by all concerned that decedent lived with his wife at "Sugarloaf," their home in Philadelphia, and that on the walls of its rooms there hung many paintings title to which was held by decedent and many paintings title to which was held by Elizabeth Realty Company. There was nothing to show which were owned by testator and which were the property of the company. All were referred to by testator as "my paintings." Many were at times placed on exhibition as the "Albert M. and Elizabeth M. Greenfield Collection." All were procured by him with the advice of his wife and were paid for by testator or by the Elizabeth Realty Company. Those purchased by the company were carried on its books as assets. Upon the dissolution of the company following Mr. Greenfield's death, its paintings came into the hands of his executors.

Members of the family and friends who visited Sugarloaf frequently were shown the paintings by testator who took great pride in them and on occasion stated that "my paintings" were to become ultimately the property of the Philadelphia Museum of Art. Individual members of the family did not know that some of the paintings were actually owned not by Mr. Greenfield, but by a corporation. Even the scrivener did not know it. There was testimony that testator was told that he should do something about the assets of Elizabeth Realty Company, which, of course, included the paintings, but nothing was done about making provision in the will concerning them as such.

Whether testator considered all of the paintings at his home as his property because either he had bought and paid for them or because the company he

and his wife owned had bought and paid for them is not determinative of the issue. The court has before it a will and the words of that will are the important words, not those spoken by testator in his lifetime.

Of course, the use of the word "my" is at times a careless use. A married person speaks of "my home," title to which is not complete in him if it is held as tenants by entireties. One speaks of "my chair," which may be actually the property of the company of which he is an officer or employe. Naturally, with his pride in possessions which were purchased with his money or the money of a company he owned, Mr. Greenfield spoke of "my paintings" as he considered them to be his and had them in his house.

However, when it comes to the solemn act of executing a will, a document to take effect at death, a testator is limited in the expression of his testamentary generosity to the property over which he alone has dominion. He cannot bequeath what is not legally his. Here, the paintings carried on the books of Elizabeth Realty Company were not Mr. Greenfield's property. They could have become so only by corporate action which would involve the rights of creditors and of Mrs. Greenfield, who owned four percent of the outstanding stock.

Testator, a man of vast experience in the world of business, was well aware of the fact that the corporate form may be and is adopted for the financial protection of the individual as a businessman or otherwise. In Section Eleventh of the will entitled, "General Powers of Executors and Trustees," testator provided in subparagraph A12: "I specifically caution my Executors or Trustees, however, against entering into any form of joint venture or partnership or of incurring any joint liability which may subject the funds of my estate or of any trust to the risk of a liability which is not limited to the particular investment."

Again, in Section Eleventh, subparagraph G, the will reads: "With respect to the stock which may be held in trust hereunder of those corporations of which I have been a majority or substantial stockholder, I direct, etc."

Again, in Section Twelfth entitled, "Loans or Investments to Children or Spouses," the will reads: "My estate may include investments or loans made to my children or their respective spouses to further their vocations, businesses or careers. Such investments or loans may have been made by me personally or by a corporation of which I was a majority or substantial stockholder. I direct that any such loans or investments if made by a corporation shall be purchased by my executors from such corporation, etc."

And in his first codicil, testator again used this phrase: "Any corporation of which I am the majority or a substantial stockholder." This language shows convincingly that testator, when preparing his will, was fully aware of the distinction between what was his asset and what was the asset of a corporation he dominated or controlled and also of what necessary step or set of steps had to be taken to pass an asset of such a corporation into his possession as legal owner.

That he employed no language to include in the coverage of the words "my paintings" those paintings held by a separate corporate entity when he knew the distinction between what he owned and what such entity owned may well be interpreted as indicative of his desire to limit the gift of the paintings to those to which he himself actually held title. The gift of "my paintings" was a valid gift and could be executed. He himself owned paintings.

It is interesting to note that, as above recited, Mr. Greenfield provided in his will that his executors were to purchase from any corporation of which he was a

majority stockholder any loans made by such corporation to his children or their spouses. That he made no such provision with respect to the paintings owned by the Elizabeth Realty Company is significant.

The inventory filed by the executors lists 2,589 shares of the corporate stock of Elizabeth Realty Company appraised at $11,360,314.68. The company assets consisted not merely of the paintings appraised at $338,950 but also of real estate and securities which comprised by far the overwhelming portion of the company's assets. Could it be seriously considered or argued that had Mr. Greenfield used in making gifts the words "my real estate" or "my securities," or both, that he had thereby intended to bequeath the real estate and securities of Elizabeth Realty Company or of any company he controlled? The answer to such a question would most undoubtedly have to be in the negative. Any other answer would be beyond the realm of logic or actuality.

So from the language of the will itself it must be found that "my paintings" mean only those to which testator held legal title and do not include the assets of a corporation created to protect the creator from personal liability. Testator enjoyed such protection at the cost of denying himself the right by his will to bequeath as his property Elizabeth Realty Company paintings.

Testator was an astute man, highly successful in business, extremely generous, public-spirited and wise enough to seek and obtain the advice of competent counsel. There was testimony by the scrivener that he and his client spent a great amount of time in the preparation of the will and discussed fully what it was to contain.

Mr. Greenfield could have made the necessary arrangements in his lifetime with the Elizabeth Realty

Company to provide for the disposition of the paintings owned by the corporation in the manner he desired. This, he failed to do. If, as argued by counsel, he attempted to accomplish this by his will, it was a futile gesture.

It is our opinion that there was no latent ambiguity in the words "my paintings" and that it was neither necessary nor proper to admit into the record any extraneous evidence to enable the court to construe that language. However, even conceding the propriety of its admission, such evidence cannot be accepted by the court in qualification or extension of the words "my paintings."

Any ambiguity there might be thought to exist because of the fact that testator owned outright only a portion of the paintings at his home does not arise from the language of his will. It exists only because of the extraneous circumstances that a corporation in which testator had a majority interest held title to paintings which various members of the family and others had been told by testator were on his death to go ultimately to the Philadelphia Museum of Art "as part of the Albert M. Greenfield and Elizabeth M. Greenfield Collection."

Conflicting with whatever representations testator made while living and with any sentiment on the part of the family that the whole collection of art objects was ultimately to go to the museum, is language throughout the will which evidences a clear understanding by testator of the distinction between "meum" and "tuum," of the distinction between his own property and that of a corporate entity.

Counsel supporting the adjudication contend that, as testator carefully thought out a detailed plan for disposition of his tangible personal property consisting of many individual items and made appropriate dis-

position thereof, it is unlikely that with his awareness of the variety of his personal property and concern for its temporary and permanent disposition, he would have intended to make no disposition of what were by far the most valuable items in his home. The answer to that contention is that "even Homer nods."

Counsel likewise suggests that as the paintings to which testator held legal title amount in value to less that one-fourth of the value of all the paintings, it is questionable whether that one-fourth would alone constitute a collection to be given the Greenfield name. The inventory shows that 49 paintings and other objects of art were appraised at $108,470.

Counsel refers to decisions of Pennsylvania courts holding that "wills are not to be interpreted in a vacuum" and that a testator's intent must be taken from the meaning of his words. They claim that a latent ambiguity exists in the words "my paintings" and cite cases supporting the introduction of extrinsic evidence to provide an interpretation of the word "my" which would give it a meaning other than that which has been given in this opinion.

To support this contention, counsel appeals to this court as a court of equity. This court has equitable powers; it is not a court of equity. This court, although possessed of equitable powers, cannot construe a will equitably however desirable in such a situation as exists in the case at bar such construction might well be. This court must follow the law of wills and interpret the words of a will presented to it without the assistance of extraneous evidence where such words are unambiguous.

As it is the actual words used by testator that control, rather than words he might have used, there was no need for oral testimony here as there is really no ambiguity here. It is unfortunate that if Mr. Green-

field wanted all the paintings that hung on the walls of Sugarloaf to belong after his wife's death to the Philadelphia Museum of Art, he did not make proper arrangements to do so. It is not for the court to effect this result in the face of the actual language of the will. The paintings owned by Elizabeth Realty Company should be accordingly treated as part of the residuary estate.

The exceptions are sustained and the adjudication is accordingly amended to effect that result. In all other respects, the adjudication is confirmed.

*Nathan M. Goodman,* for accountants.

*Duffield Ashmead, 3rd,* for Provident National Bank, trustee for Carlotta G. Howard and Nina Allen.

*Grahame P. Richards, Jr.,* for the Philadelphia Museum of Art.

*Paul Maloney,* for the Free Library of Philadelphia.

*Edward M. David,* for Gordon K. Greenfield.

*D. Arthur Magaziner,* guardian and trustee ad litem.

*Henry N. Fineman,* for Commonwealth.


## ADJUDICATION SUR EXCEPTIONS

BOLGER, J., May 22, 1972.—Albert M. Greenfield died on January 5, 1967, leaving a will and codicils which were duly probated. Letters testamentary were granted on January 10, 1967, and proof of advertisement thereof is annexed hereto. Testator was survived by a spouse, Elizabeth M. Greenfield, who, on December 22, 1967, filed her election to take against decedent's will. He was also survived by five children and certain grandchildren and great-grandchildren.

The executors filed this account on May 31, 1971.

By decree of this court dated July 9, 1971, D. Arthur

Magaziner, Esq., was appointed guardian ad litem for designated minors and trustee ad litem for all unborn and unascertained persons having a possible interest in the estate.

At the audit, four questions were presented:

1. Whether certain rare coins, a page of the Gutenberg Bible and certain Napoleona pass to named legatees outright or for life?

2. Whether a specific bequest of "my paintings" includes those held in a controlled corporation?

3. Whether the sale of Bankers Securities Corporation stock by the estate of Albert M. Greenfied to the corporation should be approved by the court?

4. Whether that portion of the dividend distributions from Greit Realty Trust, determined to be a return of capital for Federal income tax purposes, is a principal or income distribution for account purposes?

The sections of Clause Sixth of the will which are in question are:

"A. I give and bequeath to my sons, GORDON K. GREENFIELD and ALBERT M. GREENFIELD, JR., or the survivor of them, all of my jewelry, medals, decorations and citations, and all of my furniture, furnishings and personal effects located in my busness office, to be divided among them as provided in subparagraph F of this Paragraph SIXTH.

"B. I give and bequeath to my sons, GORDON K. GREENFIELD and ALBERT M. GREENFIELD, JR., or the survivor of them, the use for life of such of my rare books, original letters and manuscripts as were acquired prior to my marriage to my wife, ELIZABETH M. GREENFIELD; and I give and bequeath to my said wife the use for life of such of my rare books, original letters and manuscripts as were acquired during our marriage. At the death of each of

my said sons (or at such earlier time or times as he may wish to relinquish any of said items), as to the items bequeathed to him for life, and at the death of my wife (or at such earlier time or times as she may wish to relinquish any of said items), as to the items bequeathed to her for life, the items so bequeathed, respectively, shall pass to THE FREE LIBRARY OF PHILADELPHIA (a non-profit corporation).

"C. I give and bequeath to my sons, GORDON K. GREENFIELD and ALBERT M. GREENFIELD, JR., or the survivor of them, the use for life of such of my prints, etchings, drawings, paintings and sculpture, and any other works of art, as were acquired prior to my marriage to my wife, ELIZABETH M. GREENFIELD; and I give and bequeath to my said wife the use for life of such of my prints, etchings, drawings, paintings and sculpture, and any other works of art, as were acquired during our marriage. At the death of each of my sons (or at such earlier time or times as he may wish to relinquish any of said items) as to the items bequeated to him for life, and at the death of my wife (or at such earlier time or times as she may wish to relinquish any of said items) as to the items bequeathed to her for life, the items so bequeathed, respectively, shall pass to THE PHILADELPHIA MUSEUM OF ART, or to such other museum or gallery of art of comparable stature and standing and likewise dedicated to the exhibition of works of art to the public, as my wife may select."

Testator's sons, Gordon K. Greenfield and Albert M. Greenfield, Jr., contend that by virtue of the fact that certain personal tangible property referred to as Napoleona were deposited in a vault in decedent's business office, such property passed to them in accordance with the terms of subparagraph A above. The Free Library of Philadelphia contends, however, that

decedent's sons had a mere life estate in the Napoleona under the terms of subparagraph B.

Testator drew a clear distinction in the nature of the property bequeathed in subparagraphs B and C and it is difficult to conceive how "rare books, original letters and manuscripts" can be construed as being part of "my jewelry, medals, decorations and citations, and all of my furniture, furnishings and personal effects." "Thus, where particular words are connected with words of narrower import, if the bequest is not residuary, it will be confined to species of property ejusdem generis with those previously described": Reim Estate, 21 D. & C. 2d 650. I find, therefore, that it was the intent of testator that the articles referred to as Napoleona were given to his children for life and upon their deaths were to go to The Free Library of Philadelphia.

As to the second question involving certain works of art, testimony was admitted over the objection that it violated the parol evidence rule in that the words of the will were clear, that is, "my paintings"; the accountants contend that there is a latent ambiguity in that before "my paintings" can pass to the legatees, it is necessary to determine just what are "my paintings." I agree with the latter conception of the problem; all of the paintings in question were located in testator's residence and were not distinguishable by any note, plaque or sign indicating how the title was held. Decedent owned 96 percent of the stock of Elizabeth Realty Company and the balance of the stock was owned by his wife. For many years prior to decedent's death, the corporation was not engaged directly in business but obtained its revenues from a subsidiary corporation which owned real estate and securities and it was during this "inactive" period that the paintings were purchased. He purchased numerous

works of art, the title to which he took either in his own name or in the name of the corporation. These paintings were displayed in his home and when he showed them to his visitors, he referred to them as "my paintings" without regard to the distinction between those personally owned and those owned by the corporation. Testator's widow testified that she did not know which paintings were or were not those purchased with corporate funds; she also testified that when the collection was put on public display it was shown as being the collection of "Mr. & Mrs. Albert M. Greenfield." This was corroborated by decedent's daughter; the scrivener of the will did not know of the corporate ownership. In other matters of the corporation, the testimony revealed that he treated it as his alter ego and conducted its affairs as if there were no corporate entity. As one witness described it, he treated his corporations as another pocket.

The general rule is that the corporate entity or personality will be disregarded only when the entity is used to defeat public convenience, justify wrong, protect fraud or defend crime. "The cases on disregarding the corporate entity suggest that in order for the courts to justify piercing the corporate veil, it must be determined that the corporate fiction is being used by the corporation itself to defeat public convenience, justify wrong, . . . , perpetrate fraud or other similar reprehensible conduct": Sams v. Redevelopment Authority, Appellant, 431 Pa. 240. Obviously none of those conditions are present in the instant case but the course of decedent's conduct with respect to the corporate affairs, as evidenced by the testimony before us, clearly indicates that he conducted the affairs of the corporation in a manner indicating an indifference to the niceties of corporation law.

There appear to be no cases in this jurisdiction

where piercing the corporate veil was used in the determination of a testamentary intent; however, in nearby jurisdictions there is ample precedent for doing so. A New York case closely analogous to ours is that of In re Burr's Estate, 175 N.Y. Misc. 725, wherein the owner of 93 percent of the stock of a personal holding company, with his wife owning the remaining 7 percent, bequeathed stock of another company, the title to which was in his controlled corporation. The court sustained the legacy stating, "If the property exists in substance and is still *owned or controlled* by the testator at the time of his death, the intention to bequeath it must be carried out." (Italics supplied.)

The corporation was clearly his alter ego and we should look to the substance rather than to the form in carrying out his intent; an intent to benefit the public rather than a private interest. His love for the City of Philadelphia was evident during his life in the civic affairs to which he lent his name, his will attests to it, and it would be sad, indeed, if in the circumstances of this case, his last gesture was thwarted by the nice distinctions between corporate and individual ownership. "Wills are not to be interpreted in a vacuum. A testator's intent must be taken from the meaning of his words, but his Will and a dictionary cannot always solve problems of interpretation": Gibson v. McBurney, Appellant, 399 Pa. 195. In that case, the court cited Newlin Estate, 367 Pa. 527 (1951), as follows: "The testator's intent must be ascertained by a consideration of the entire will, which of course must be read in the light of the circumstances surrounding him when he made it." See also Vandergrift Estate, 406 Pa. 14. His widow, although electing to take against his will, indicated by her testimony that she does not wish to include in her election any of these paintings and as a minority shareholder, she also interposes no

objection to the passing of these art treasures to the Philadelphia Museum of Art.

We are constrained, in order to carry out the obvious intent of testator, to hold that when he stated "my paintings" and other similar expressions in his will, he referred to such objects whether owned or possessed by him, or whether he owned the legal or equitable title thereto.

The remaining questions, that is, one with respect to the sale of Banker Securities Corporation stock by the estate to the corporation, and the other with respect to the allocation of dividend distributions received from Greit Realty Trust, between principal or income have been settled by agreement among the parties.

The guardian and trustee ad litem, in his report, has recommended confirmation of the account and has indicated his acquiescence with the decision which has been made herein. As compensation for his services, he has requested the sum of $25,000 and reimbursement of costs in the amount of $168.60; an objection has been entered with respect to the amount claimed. The guardian's report is an excellent one and, in view of the importance of the issues involved and the extraordinary services required of him in this accounting as well as that of the account of the residuary trust for the benefit of Gordon K. Greenfield, I believe that a fee of $20,000 is appropriate, which sum is directed to be paid.

Counsel for the accountant on his appearance slip has requested certain adjustments in addition be made to the account as follows: principal disbursements in the amount of $50,000 each on December 7, 1967, December 4, 1968, and December 22, 1969, shown on pages 8, 9 and 10 in the account, which were reported as costs, should be corrected to read legal fees; and

income disbursement dated July 22, 1970, in the amount of $165,110.42, reported on page 127 as interest on Federal estate tax, should be corrected to read a principal disbursement; additional principal disbursements representing indebtedness incurred by Albert Company, Elizabeth Realty Company and Realty Owning Company for legal services rendered in the amount of $4,750, $7,500 and $5,500, respectively; additional principal disbursements representing legal fees in administering the estate in the amount of $15,357, and additional principal disbursements representing executors' commission in the amount of $22,678.50 each to Gustave G. Amsterdam and Bruce H. Greenfield.

The account shows a balance of

| | |
|---|---:|
| principal personalty of | $8,646,826.72 |
| principal realty of | 467,600.23 |
| and a balance of income of | 979,406.71 |
| making a combined total of | $10,093,833.66 |

which composed as indicated, together with items received since the filing of the account and subject to corrections and additions noted above, subject to such Pennsylvania Inheritance Tax found due and assessed, subject to payments heretofore properly made, and subject to the payment of $20,000 to D. Arthur Magaziner, Esq., as compensation for services as guardian and trustee ad litem and costs of $168.60, are awarded in accordance with the statement of proposed distribution.

Leave is hereby granted to the accountants to make all necessary transfers and assignments.

A schedule of distribution, in duplicate, duly certified by counsel to be correct and in conformity with

this adjudication and, if distribution is to be made in kind, approved by all parties in interest therein, shall within 90 days after the absolute confirmation of this account be submitted by the accountants to the auditing judge. The schedule, when approved by him and hereto annexed, will form part hereof.

A certificate of the official examiner as to his examination of the assets composing the fund awarded to be retained in trust will be submitted to me.

And now, May 22, 1972, the account is confirmed nisi.

## SUPPLEMENTAL ADJUDICATION

BOLGER, J., October 10, 1972.—In my adjudication of May 22, 1972, I concluded that two questions presented at the audit of the executors' account had been resolved by agreement of the parties.

The questions were:

(a) Whether the sale of Bankers Securities Corporation stock by the Estate of Albert M. Greenfield to the corporation should be approved by the court?

(b) Whether that portion of the dividend distribution from Greit Realty Trust, determined to be a return of capital for Federal income tax purposes, is a principal or income distribution for account purposes?

By his will, decedent gave very broad administrative powers to his executors and trustees and provided that they should not be held liable for any discretionary act which was taken in good faith. The evidence is clear that the personal representatives who had a financial interest in the Bankers Securities Corporation carefully refrained from participating in the decision to sell the stock. In addition, the other personal representatives sought the advice of impartial stockbrokers before making their decision. The court

finds that the sale of stock was made in good faith and therefore under the terms of the will, the executors and trustees are exonerated from any or all personal liability. The evidence also shows, in retrospect, that the sale was in the best interest of the estate because the price of the stock declined subsequent to the sale. Accordingly, the sale of the stock is approved.

Testator owned shares of beneficial interest of Greit Realty Trust which is a real estate investment trust as defined by the Internal Revenue Code; the latter requires a minimum percentage distribution of income and such income when distributed is treated for tax purposes as partly a return of capital.

There appears to be no authority in Pennsylvania on the question of whether such distributions are principal or income for fiduciary accounting purpose. The Pennsylvania Supreme Court, in Brock Estate, 420 Pa. 454 (1966), treating a similar problem arising from a distribution from an open end investment company, held that the capital gains were properly allocable to principal under section 5(3) of the principal and income account. The problem in the Brock Estate is so analogous to that involved herein that I am of the opinion that it is controlling and therefore hold that the so-called capital gains are properly a part of income.

The hearings on the question relative to decedent's assets known as the Napoleona resulted in the erroneous conclusion that certain rare coins were part thereof. These coins are properly part of the personal effects bequeathed to Gordon K. Greenfield and Albert M. Greenfield, Jr., under Section Sixth A of decedent's will and are, therefore, awarded to the above-named individually.

In all other respects my prior adjudication is confirmed.